[No. F038524. Fifth Dist. Apr. 23, 2003.]

JOHN MUCCIANTI et al., Plaintiffs and Respondents, v.
WILLOW CREEK CARE CENTER et al., Defendants and Appellants

## COUNSEL

Horvitz & Levy, Mitchell C. Tilner, Sandra J. Smith, David S. Ettinger; Law Offices of Mark Schreiber, Mark Schreiber, Jeffrey B. Stoltz; Law Offices of David B. Bloom and David B. Bloom for Defendants and Appellants.

Wilkes & McHugh, Stephen M. Garcia, David T. Bamberger and Jennifer I. Rissier for Plaintiffs and Respondents.

## OPINION

**WISEMAN, J.**—This case addresses application of Code of Civil Procedure section 128, subdivision (a)(8),[1] in the context of a request to vacate a multimillion-dollar verdict against a health care facility. The parties appear to assume that their request unquestionably will be granted and that we will give our judicial blessing to what is, for all practical purposes, a stipulated reversal. This assumption is based upon the parties' apparent belief that the judgment belongs solely to them to use in a manner that is in their best interests. What they fail to recognize is that under section 128, subdivision (a)(8), their assumption is no longer legally correct. This judgment now belongs to the public—not the parties—and the public indisputably has an interest in its continuing existence.

A brief review of the circumstances is warranted. Plaintiffs and respondents John Muccianti and Dorothy Beard, individually and as successors in interest of Margaret Muccianti, deceased (plaintiffs), filed a wrongful death action against defendants and appellants Willow Creek Care Center, Summit Corporation and Fountain View Corporation (collectively Fountain View). Plaintiffs' mother died shortly after she was discharged from Willow Creek Care Center, a long-term, 24-hour health care facility. A jury returned a verdict in excess of $5 million in favor of plaintiffs. After filing a notice of appeal, Fountain View reached a settlement with plaintiffs under which plaintiffs consented to vacation of the judgment. Fountain View then moved to vacate the judgment. Later, plaintiffs moved to dismiss the appeal.

We conclude that the requirements of section 128, subdivision (a)(8), have not been met since vacation of this judgment will likely affect the rights of nonparties (e.g., prospective patients and insurance carriers) and erode the public trust. Further, based on the clarity of the parties' settlement agreement, we see no choice but to dismiss the appeal as moot.

### PROCEDURAL AND FACTUAL HISTORIES

On February 5, 1998, 65-year-old Margaret Muccianti was admitted to Willow Creek Care Center as a Medicare patient. At the time, Willow Creek Care Center was owned and operated by Summit Care California, Inc., a wholly owned subsidiary of Summit Care Corporation. Muccianti was diagnosed with chronic obstructive pulmonary disease, acute bronchitis and bronchiolitis, pneumonia, hypertension, congestive heart failure, diabetes and anxiety. Muccianti had stayed at the facility three times before, beginning in 1997.

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

Over the next several weeks, Muccianti was treated by Juan Touya, M.D., a physician specializing in the treatment of geriatric patients. Touya visited Muccianti two or three times per week. Muccianti's psychiatrist diagnosed her as having a major depression with anxiety. In addition to receiving antidepressant and anti-anxiety medication, Muccianti was counseled weekly by a therapist. She complained that she wanted to go home and that the Willow Creek Care Center staff did not pay attention to her.

According to several nurses and certified nursing assistants at Willow Creek Care Center, the facility was frequently understaffed, making it difficult to properly care for patients. For example, the nursing staff usually could not check on patients and turn them in their beds every two hours as required. Patients often were not checked for over three hours and were sometimes found lying in their own waste.

Muccianti did not keep a schedule for meals and often refused the food served to her, despite being offered different choices in her diet. Instead, she ate junk food from the vending machines and cookies brought by her family. Muccianti was treated for nausea and vomiting, some of which was self-induced. She complained of having no appetite and was losing weight. However, Touya found nothing abnormal in examining Muccianti's abdomen. Touya was concerned about Muccianti's diet because of her diabetes, which he described as "out of control." Muccianti consistently refused to attend physical therapy because she did not feel well. According to Fountain View, Medicare will not pay for a patient who shows no improvement or who consistently refuses to participate in physical therapy, even if the patient is still sick.

By March 6, 1998, Muccianti complained of having anterior abdominal pain. Touya concluded Muccianti was not suffering from an infection in her abdomen, ischemic necrosis of the bowel, or a urinary tract infection. He did not definitively identify the cause of her pain.

On March 8, 1998, Touya received a call from someone at Willow Creek Care Center requesting he discharge Muccianti. Touya did not approve of the discharge because of Muccianti's psychiatric/psychological condition. In fact, he had expected Muccianti would remain in the nursing home for a long time. Touya consulted with Muccianti's psychiatrist, who advised him to focus on her physical, rather than mental, condition. Muccianti's psychiatrist opined that her condition could be treated on an outpatient basis. Touya also spoke to Willow Creek Care Center's medical and nursing directors. As a result of these discussions, Touya reached the conclusion that it was medically safe to discharge Muccianti. During this process, Touya was informed that Muccianti's Medicare benefits had been exhausted.

On March 9, 1998, Muccianti was discharged. Touya examined Muccianti to ensure she was not suffering from any physical or medical condition that would preclude her discharge. Touya again concluded, based on a physical examination and lab reports, that Muccianti was not suffering from ischemic necrosis of the bowel. Touya found Muccianti's prognosis to be poor. According to Touya, the sole reason for Muccianti's discharge was because her Medicare benefits had run out and the family was incapable of paying the fee privately.

Approximately 16 hours after her discharge, Muccianti collapsed at her daughter's home. On March 10, 1998, Muccianti was admitted to Saint Agnes Medical Center, but the physicians could not ascertain the problem. Muccianti died on March 12, 1998. An autopsy revealed she died from ischemic necrosis of the bowel, secondary to mitral valve emboli. The state Department of Health Services investigated the incident and later issued a citation, finding that Willow Creek Care Center's failure to assess Muccianti's medical condition, identify and treat her dehydration in a timely manner, and/or implement the care plan as written proximately caused her death.

On March 28, 1998, FV-SCC Acquisition Corp., a wholly owned subsidiary of Fountain View, Inc., purchased all outstanding shares of Summit Care Corporation. The parties had signed the merger agreement on February 6, 1998. Under the agreement, FV-SCC Acquisition Corp.'s separate corporate existence ceased upon consummation of the merger, and Summit Care Corporation continued as the surviving corporation and became a wholly owned subsidiary of Fountain View, Inc. Prior to March 28, 1998, Fountain View, Inc., had no ownership interest in either Summit Care Corporation or Summit Care California, Inc., and had no connection to Willow Creek Care Center.

On January 12, 1999, plaintiffs filed suit against Fountain View, among others. Plaintiffs' second amended complaint alleged eight causes of action: 1) willful misconduct; 2) negligence; 3) intentional infliction of emotional distress; 4) elder abuse; 5) fraud—misrepresentation; 6) fraud—concealment; 7) wrongful death; and 8) unlawful business practices. Although the record is unclear, it appears plaintiffs dismissed and/or abandoned one of the fraud claims and the unfair business practices claim.

A jury found in favor of plaintiffs on claims for negligence, negligent infliction of emotional distress and willful misconduct. It awarded plaintiffs $94,927.63 in economic damages, $623,000 in noneconomic damages, and $4.5 million in punitive damages ($1.5 million against each of the three defendants). The court awarded plaintiffs $375,777.19 in attorney fees and

$44,803.28 in costs. Fountain View appealed. Fountain View then filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, title 11 of the United States Code. The bankruptcy court later lifted the automatic stay on this action.

Before Fountain View filed its opening brief, the parties settled. Under the terms of the settlement agreement, Fountain View's insurers agreed to pay plaintiffs the sum of $1,050,000. Plaintiffs agreed to consent to vacation of the judgment, and Fountain View agreed to dismiss the appeal. The bankruptcy court approved the settlement. Fountain View moved to vacate the judgment in light of the settlement. We deferred ruling on the motion, and Fountain View filed its opening brief. Plaintiffs subsequently moved to dismiss the appeal in light of the settlement.

DISCUSSION

We have two motions before us: 1) Fountain View's motion to vacate the judgment and 2) plaintiffs' motion to dismiss the appeal. We begin with the motion to vacate the judgment.

I. *Motion to vacate the judgment*

■ In addressing Fountain View's motion to vacate the judgment in light of the parties' settlement, it is enlightening to examine the history of the use of stipulated reversals of judgments. Prior to January 1, 2000, our power to reverse or vacate a trial court's judgment when the parties reached a stipulation as a condition of a proposed settlement pending appeal was governed by *Neary v. Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119]. In *Neary*, the California Supreme Court held:

"[W]hen the parties to an action agree to settle their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule. Any determination that such circumstances exist must be made on a case-by-case basis. Because we can only speculate as to the facts of future cases, we cannot enumerate with any specificity what facts may or may not constitute an extraordinary circumstance that would warrant denying the parties' request. We emphasize, however, that the policies favoring settlement are strong and that the extraordinary-circumstance exception is narrow.

"A presumption in favor of stipulated reversal to effectuate settlement, rather than a presumption against the procedure, is also more efficient in

terms of the resources required of an appellate court. . . . Under a presumption in favor of granting the parties' request for reversal, the court need not expend significant resources unless a nonparty comes forward and objects to the settlement for some reason or unless some problem is apparent in the record." (*Neary v. Regents of University of California, supra,* 3 Cal.4th at p. 284.)

The judicial rule set forth in *Neary,* upholding stipulated reversals in the absence of extraordinary circumstances, was superseded by the Legislature in 1999. The legislative analysis to Assembly Bill No. 1676 (1999-2000 Reg. Sess.), concerning stipulated reversals of judgment, explained: "This bill seeks to bring California appellate practice in line with that of the federal courts and the courts of almost every other state by prohibiting California state appellate courts from approving reversals of trial court judgments based on post-trial stipulations of the parties absent specific findings that the reversal would not adversely affect the interests of nonparties and the public. In so doing, this bill follows the United States Supreme Court opinion in [*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership* (1994) 513 U.S. 18 [115 S.Ct. 386, 130 L.Ed.2d 233]] and overrules the controversial 1992 <u>Neary</u> decision by the California Supreme Court which directed state appellate courts to engage in this practice due largely to considerations of judicial efficiency." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1676 (1999-2000 Reg. Sess.) as amended July 14, 1999, p. 2.)

Effective January 1, 2000, section 128 was amended to read:

"(a) Every court shall have the power to do all of the following: [¶] . . . [¶]

"(8) To amend and control its process and orders so as to make them conform to law and justice. An appellate court shall not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties unless the court finds both of the following:

"(A) There is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal.

"(B) The reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (See also 9 Witkin, Cal. Procedure (2003 supp.) Appeal, § 784A, pp. 221-222 [*Neary* presumption in favor of stipulated reversals superseded by Legislature].)

There is little case law applying the new provisions of section 128, subdivision (a)(8). In fact, we found only two published cases addressing the 1999 amendment to section 128, *In re Rashad H.* (2000) 78 Cal.App.4th 376 [92 Cal.Rptr.2d 723], and *Union Bank of California v. Braille Inst. of America, Inc.* (2001) 92 Cal.App.4th 1324 [112 Cal.Rptr.2d 604], both from Division Five of the Second District Court of Appeal.

In *In re Rashad H., supra*, the court concluded that the section 128, subdivision (a)(8), factors were satisfied for a stipulated reversal of an order terminating parental rights. The court determined that the order was invalid because the parent failed to receive the required notice. (*In re Rashad H., supra*, 78 Cal.App.4th at p. 378.) In applying the section 128, subdivision (a)(8), requirements, the court made the following findings: (1) the stipulated reversal would not adversely affect the rights of any nonparty or the public, since the minors had been placed with foster parents and not yet with prospective adoptive parents; (2) the stipulated reversal, which was premised on actual judicial error in the trial court, would not erode the public trust; and (3) the stipulated reversal would not reduce the incentive for pretrial settlement. (*Rashad*, at pp. 380-381.)

In *Union Bank of California v. Braille Inst. of America, Inc.*, the court reversed an order relating to the appointment of successor cotrustees and modification of the trust pursuant to the parties' stipulation. The court found that all three requirements of section 128, subdivision (a)(8), were met: (1) there was no evidence the settlement would adversely affect the interests of nonparties or the public because there were no nonparty interests and the beneficiaries would be spending money on charitable causes rather than legal fees; (2) there was no indication that any erosion of public trust would arise from a judicially approved reversal of two probate court orders, which ultimately would serve the interests of the charitable beneficiaries, the trust and the public; and (3) there was no evidence that the availability of the stipulated reversal would reduce the incentive for pretrial settlement. (*Union Bank of California v. Braille Inst. of America, Inc., supra*, 92 Cal.App.4th at pp. 1329-1330.)

The *Union Bank of California* court recognized that, unlike in *In re Rashad H.*, there was no identifiable reversible judicial error. The court noted that the presence of reversible error is pertinent in the section 128, subdivision (a)(8), analysis. For example, if there is reversible error, prompt resolution of the appeal serves the public interest by reducing the expense to the parties and the taxpayers. And the purported erosion in the public's faith in the judicial system when a judgment is reversed is materially mitigated when the reversal would have occurred in any event and the parties agree to accept the

inevitable. The court further observed that the public trust in the courts is enhanced by settlements of pending appeals and related litigation. (*Union Bank of California v. Braille Inst. of America, Inc.*, *supra*, 92 Cal.App.4th at pp. 1330-1331.) The court concluded: "[I]n exercising discretion on a case-by-case basis in evaluating whether the three factors in section 128, subdivision (a)(8) are present, it is relevant that reversible error occurred but it is not a prerequisite to the judicial acceptance of a stipulated reversal in a case such as this which does not involve collateral licensing or discipline ramifications." (*Union Bank of California v. Braille Inst. of America, Inc.*, *supra*, 92 Cal.App.4th at p. 1331.)

As recognized in *In re Rashad H.*, *supra*, 78 Cal.App.4th at page 381, "applying the new provisions of . . . section 128, subdivision . . . (a)(8) is to be done by an appellate court on a case-by-case basis." In this particular case, the requirements of section 128, subdivision (a)(8), present a problem.

With respect to the first prong of section 128, subdivision (a)(8), there certainly appears to be a reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal. The claim here was against a health care facility, one that treated the elderly. The jury found negligence and willful misconduct on the part of Willow Creek Care Center. The treatment received by Muccianti is an issue relevant to the public in deciding future placement for its citizens. A vacation of the judgment may deny the public the ability to discover Willow Creek Care Center's bad acts. Our conclusion is not altered by the fact that Willow Creek Care Center had a change of ownership. There is no evidence that, given this change of ownership, there was any change in the operations or staffing of the facility. As a result, the same public safety concerns remain.

In addition, unlike in *Union Bank of California*, the judgment here has potential collateral licensing and insurance ramifications. (See *Union Bank of California v. Braille Inst. of America, Inc.*, *supra*, 92 Cal.App.4th at p. 1331; cf. *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1994) 22 Cal.App.4th 1814, 1821-1823 [28 Cal.Rptr.2d 498] [denying parties' joint request for reversal of judgment as to real estate broker, where judgment could have been used as sole basis for license suspension or revocation].) We recognize that the state Department of Health Services already investigated plaintiffs' complaint against the facility and issued a formal citation. As a result, the judgment would appear to have no further effect in that matter. However, it may be relevant in future licensing and/or disciplinary proceedings against the facility. We asked the parties for supplemental briefing on the issue of collateral licensing and discipline ramifications for Fountain View as a result of the judgment. Through this briefing, we

discovered not only further licensing issues affected by the judgment, but additional insurance and reporting issues as well.

Fountain View first alerted us to Health and Safety Code section 1305, subdivision (a), which provides: "Every insurer providing professional liability insurance to a health facility licensed pursuant to this chapter . . . shall report periodically, but in no event less than once each year, to the state department any final judgment over three thousand dollars ($3,000) rendered against such health facility during the preceding year in . . . a claim or action for damages for personal injuries caused by an error, omission, or negligence in the performance of its professional services . . . ." Health and Safety Code section 1307, in turn, requires the state Department of Health Services to keep a record of all reports made pursuant to Health and Safety Code section 1305.

The judgment plainly does affect the availability and cost of insurance for Fountain View, a matter of interest to insurers providing professional liability insurance to health care facilities. The judgment is also made a part of State Department of Health Services records, evidencing an interest to the public. In addition, Fountain View concedes that the judgment may adversely affect its licensing and operations outside of California, as some states require disclosure of all judgments for malpractice and prior approval for the acquisition of new facilities. Finally, Fountain View maintains the judgment reflects poorly on its performance and will likely damage Willow Creek Care Center's reputation in the community. Fountain View has, in effect, made our point for us. The judgment is of undeniable interest to the public. As a result, we find there is a reasonable possibility that the interests of nonparties and the public would be adversely affected by its vacation.

With respect to the second prong of section 128, subdivision (a)(8), we cannot find that the reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from a nullification of the judgment. We recognize that plaintiffs have an interest in settling with Fountain View in light of the pending bankruptcy proceeding and this appeal. However, the public trust clearly could be undermined where a nursing facility has findings of negligence and willful misconduct expunged from the public record. There is no question that the public has an interest in issues related to health care facilities. A court-ordered vacation of the judgment could well be interpreted as a judicial nullification of the jury's findings that Willow Creek Care Center was negligent and engaged in willful misconduct in Muccianti's treatment and care. (See *Norman I. Krug Real Estate Investments, Inc. v. Praszker, supra,* 22 Cal.App.4th at p. 1823.)

This interpretation is particularly true where reversible error has not been conclusively shown. Although we have Fountain View's opening brief, we

are not in a position to evaluate the merits of the appeal. Plaintiffs' responding brief does not address the underlying merits, no doubt, because, under the terms of the settlement agreement, plaintiffs must consent to vacation of the judgment.

Since we find that the requirements of section 128, subdivision (a)(8), have not been satisfied, we deny Fountain View's motion to vacate the judgment.

## II. *Motion to dismiss the appeal*

Plaintiffs moved to dismiss the appeal in light of the parties' settlement agreement. That agreement states:

"1. Lloyds will promptly pay $1 million to [Fountain View's] third party administrator, ProClaim. Pro[C]laim will hold such funds in a segregated trust account pending bankruptcy court approval of this settlement.

"2. AIG/AIU will promptly pay $50,000 to [Fountain View's] third party administrator, ProClaim. ProClaim will hold such funds in a segregated trust account pending bankruptcy court approval of this settlement.

"3. Upon entry of a final bankruptcy court order approving the settlement, ProClaim shall release the monies held in trust to [plaintiffs' counsel] . . . . Should the bankruptcy court enter an order denying [Fountain View's] motion to approve this settlement agreement, this agreement shall be void and of no effect, and the monies held in trust will be promptly returned to the respective insurers.

"4. Upon [plaintiffs' counsel's] receipt of $1,050,000 in accordance with the terms of this settlement, [plaintiffs] (i) shall be deemed to have fully and forever released and discharged [Fountain View] . . . from any and all judgments, claims, liens, liabilities of any kind or nature whatsoever from the beginning of time to the date of this agreement (ii) shall execute such further documentation evidencing the release of such judgments, claims, liens, liabilities as [Fountain View] or [its] insurers may request (iii) shall be deemed to consent to the vacation of the Judgment in the Muccianti Case . . . . [¶] . . . [¶]

"6. [Fountain View] shall promptly move the bankruptcy court for an order approving this settlement on shortened notice. Upon entry of such an order, [Fountain View] will promptly dismiss [its] appeal of the Muccianti Case."

The bankruptcy court approved the settlement. Plaintiffs received the $1,050,000 settlement proceeds. The settlement agreement only provides for

plaintiffs to consent to vacation of the judgment. It does not mandate that the judgment be vacated. In fact, it makes no provision for the situation where the judgment is *not* vacated. Although the agreement provided for its own nullification if the bankruptcy court failed to approve the settlement, it has no similar provision in the event the request to vacate the judgment is denied.

Because the settlement agreement is valid even in the case where we deny the motion to vacate the judgment, we find the appeal moot. (See *Rancho Solano Master Assn. v. Amos & Andrews, Inc.* (2002) 97 Cal.App.4th 681, 688 [119 Cal.Rptr.2d 100] ["settlement terminate[s] all issues relating to the litigation"]; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005 [78 Cal.Rptr.2d 272] [parties' settlement of dispute commonly results in mootness of appeal].) We therefore grant plaintiffs' motion to dismiss the appeal. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206, 226-227 [123 Cal.Rptr.2d 735] [court will dismiss appeal where questions raised have become moot by subsequent acts or events].)

## DISPOSITION

The motion to vacate the judgment is denied. The appeal is dismissed. Costs shall be borne by each party.

Dibiaso, Acting P. J., and Harris, J., concurred.