Filed 7/12/13  Brough-Stevenson v. Community Emergency Medical Assocs. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GLORIA BROUGH-STEVENSON,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>COMMUNITY EMERGENCY MEDICAL ASSOCIATES et al.,<br><br>Defendants and Appellants. | F063875<br><br>(Super. Ct. No. 11CECG01089)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Donald S. Black, Judge.

Dowling Aaron Incorporated, Donald R. Fischbach, Daniel O. Jamison, Stephanie Hamilton Borchers and Matthew R. Dildine for Defendants and Appellants.

Smith Johnson, Inc., William J. Smith, Kirby F. Cañon and C. Michael Carrigan for Plaintiff and Respondent.

-ooOoo-

Appellants, Community Regional Medical Center (CRMC), Clovis Community Medical Center (Clovis Community), Craig Castro, Craig Wagoner, Mason Mathews,

R.N., and Gene Kallsen, M.D., challenge the trial court's denial of their motion to strike the complaint filed by respondent, Gloria Brough-Stevenson, M.D., as a strategic lawsuit against public participation (SLAPP). (Code Civ. Proc.,[1] § 425.16.) Respondent's causes of action are based on allegedly defamatory statements made by appellants regarding respondent's performance as an emergency room physician. Appellants contend that the subject statements are entitled to protection under section 425.16 as acts in furtherance of their right of free speech because public health and accessibility of health care are issues of widespread public interest.

The trial court's ruling was correct. The challenged statements concern a private internal grievance that is only tangentially related to an issue of widespread public interest. Accordingly, the order will be affirmed.

## BACKGROUND

Respondent is a licensed physician and surgeon and is board certified in emergency medicine. Respondent was a partner in Community Emergency Medical Associates (CEMA), a group of emergency medical practitioners that contracted with CRMC and Clovis Community to provide emergency room physicians. Respondent had staff privileges at both hospitals.

Craig Castro is the chief executive officer for Clovis Community. His duties include overseeing the delivery of emergency medical services. In doing so, Castro receives reports and input on the emergency department's performance from his subordinates, including the RN manager, Mason Mathews. Castro also communicates with Santé Health Systems, Inc. (Santé), the management services organization for CEMA.

---

[1]    All further statutory references are to the Code of Civil Procedure.

2.

Beginning in 2008, Castro became concerned about the overall performance and quality of the Clovis Community emergency department. Based on his declaration, it appears Castro was primarily focused on the number of emergency patients seen per hour. Due to emergency departments providing a large measure of uncompensated care, Clovis Community was paying CEMA an additional approximately $405,000 per year to adequately compensate the physicians for their services. Castro noted that CEMA physicians were seeing approximately one patient per hour when industry standards were several more per hour. Castro stated that, if the one patient per hour standard were increased, the size of this subsidy could be greatly reduced, if not eliminated. Castro was also receiving complaints from specialty physicians. The emergency room physicians involved these specialty physicians in matters that an emergency room physician should have been able to handle without calling for back up. Further, Castro received complaints from physicians and hospital staff that many of the CEMA physicians were not service oriented. However, Castro's performance concerns were limited. According to Castro, "all of the physician and 'mid-level' (meaning nurse practitioner or physician's assistant) providers were believed to be basically competent, qualified, and of suitable character."

In 2010, Castro brought these complaints to the attention of CEMA and Santé. In response, a Santé employee, Carolyn Larsen, requested information by e-mail on the emergency room doctors who had received complaints in order to prepare for a meeting with the hospital board of directors. Mathews, the RN manager, responded to Larsen's request.

Mathews identified multiple doctors who had received complaints. Regarding respondent, Mathews stated she was "slow, involved in nursing issues that have nothing to do with her, and lost pieces of chart." Mathews further opined that respondent "Needs to retire. SLOW!! Passive aggressive behavior with ED leadership and staff. Cannot

3.

keep up with dept. flow.  Missing T- sheets.  Too busy worrying about other people's concerns and has tendency to get involved in issues that have nothing to do with her."

In his declaration, Mathews further explained that while respondent and the other doctors "were all competent and qualified, the issues cited in these e-mails reflected a systemic problem with these physicians not performing at a high level and in a collegial, team-player manner, all of which are essential to optimal performance of the entire emergency service at Clovis."  Mathews listed the particular concerns regarding respondent as follows:

"a.  She felt she needed to be involved in nursing issues.  Per staff, instead of addressing the issues with management directly, she would consistently make comments to staff about what Emergency Department management could and should do to improve work environment.

"b.  During shifts, she would arrive and wait for a nurse practitioner or physician's assistant (NP/PA) to arrive to see less urgent patients.  This would cause a backup in department flow and decrease satisfaction of patients and staff.  This issue was brought to my attention by NP/PA staff.

"c.  Nurses would approach her about seeing high acuity patients who were in pain, but she would write out orders to be carried out instead of seeing patient emergently.

"d.  She would take personal phone calls before seeing patients which would in turn delay patient care and treatment (which could potentially delay medical diagnosis).  Fortunately, there were never any cases which had negative outcomes.

"e.  She would make comments to Emergency Department staff about not wanting to get in trouble with Emergency Department manager because she was not doing what she needed to do.  This eroded the morale of the Emergency Department staff and conveyed to them that the manager was difficult to work with.

"f.  There were multiple patient complaints pertaining to her bedside manner which caused negative impact on department satisfaction scores.

"g.  Multiple staff members had made comments about particular comments that she said to EMS staff.  Her reported comments were to the

4.

effect that the Clovis Emergency Department was not the best choice to bring particular patients.

"h. She challenged Emergency Department leadership (both physician and nursing) authority in front of staff. Per staff, she was undermining Emergency Department management.

"i. Particular patients who frequently visited the Emergency Department for pain issues were not seen according to severity."

After this information was shared with the hospital administrators and CEMA, respondent was precluded from practicing at Clovis Community and CRMC. Ultimately, respondent was terminated by CEMA.

Respondent filed the underlying complaint for defamation, interference with contract, interference with prospective economic advantage, interference with the right to practice medicine, and negligence. Respondent's claims were based on the following allegedly defamatory statements:

1. "Dr. Brough told paramedics that they should have taken a patient to St. Agnes Hospital instead of Clovis Community because the patient would receive better and more competent care at St. Agnes Hospital";

2. "Dr. Brough was slow and could not keep up with the work flow in the Clovis Community emergency department";

3. "Dr. Brough was passive-aggressive with the Clovis Community emergency department staff and leadership";

4. "Dr. Brough interfered with nursing issues";

5. "Dr. Brough was either incompetent or disorganized, resulting in missing or lost patient chart documentation";

6. "Dr. Brough was incompetent and negligent in her care of a patient who presented at the Clovis Community emergency department with shortness of breath and was not admitted by Dr. Brough";

7. "Dr. Brough was not qualified or capable of doing her job and should retire";

8. "Dr. Brough had poor productivity";

5.

9. "Dr. Brough made too many personal telephone calls while on duty";

10. "Dr. Brough spent too much time on personal e-mails while on duty"; and

11. "Dr. Brough called hospitalists for admission of patients before the patients' test results were obtained and even before Dr. Brough had even examined the patients."

In response, appellants filed an anti-SLAPP motion under section 425.16. Appellants argued that the alleged statements were directly tied to public health issues and thus concerned a matter of public interest that warranted protection under section 425.16, subdivision (e)(4). In support of their motion, appellants submitted declarations from Kallsen, Castro, and Mathews.

The trial court denied appellants' motion. The trial court found that appellants had not shown that the conduct involved public issues or matters of public interest. Rather, the court concluded that the alleged communications "involved nothing more than the internal business matters of a corporation." The court noted that the concern over the number of patients per physician hour seen in the emergency department was raised in the context of the income generated by CEMA's physicians, the reduction or elimination of the subsidy paid by Clovis Community to CEMA, and maintaining a competitive advantage. Thus, the matter of public interest, i.e., health care, was tangential to the subject communications. The court further pointed out that the alleged statements "were not made in connection with any ongoing controversy, debate, or discussion within and among a definable portion of the public."

## DISCUSSION

**1.**      *The anti-SLAPP statute.*

Section 425.16 was enacted in 1992 to provide a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v.*

6.

*Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) It is California's response to meritless lawsuits brought to harass those who have exercised these rights. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 644, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68.) This type of suit, referred to under the acronym SLAPP, or strategic lawsuits against public participation, is generally brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 927.)

When served with a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16. To determine whether this motion should be granted, the trial court must engage in a two-step process. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.)

The court first decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 76.) The moving defendant must demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue …." (§ 425.16, subd. (b)(1); *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) If the court concludes that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.)

The questions of whether the action is a SLAPP suit and whether the plaintiff has shown a probability of prevailing are reviewed independently on appeal. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) Further, the anti-SLAPP statute is to be broadly construed. (§ 425.16, subd. (a).)

**2.**     *Appellants did not meet their burden of demonstrating that the allegedly defamatory statements were entitled to protection under section 425.16.*

Section 425.16, subdivision (e), clarifies what speech constitutes an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.'"  Such speech includes: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)  Appellants contend that their statements fall under section 425.16, subdivision (e)(4), i.e., they were in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest.

It should first be noted that protection under section 425.16 for statements in connection with a public issue or an issue of public interest is not dependent on those statements having been made in a public forum.  Rather, subdivision (e)(4) applies to private communications concerning issues of public interest.  (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1546.)

Section 425.16 does not define "an issue of public interest."  Nevertheless, the statute requires the issue to include attributes that make it one of public, rather than merely private, interest.  (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132.)  A few guiding principles can be gleaned from decisional authorities.  For example, "public interest" is not mere curiosity.  Further, the matter should be something of concern to a substantial number of people.  Accordingly, a matter of concern to the speaker and a

8.

relatively small, specific audience is not a matter of public interest. Additionally, there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest is not sufficient. Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy. Finally, a defendant charged with defamation cannot, through his or her own conduct, create a defense by making the claimant a public figure. Otherwise private information is not turned into a matter of public interest simply by its communication to a large number of people. (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at pp. 1132-1133.)

Being based on case law, the precise boundaries of a public issue have not been defined. Nevertheless, in each case where it was determined that a public issue existed, "the subject statements either concerned a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread, public interest [citation]." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 (*Rivero*).)

It has been held that in cases where the issue is not of interest to the public at large, but rather to a limited definable portion of the public, the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion. (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.) However, when the issue is of "'*widespread* public interest,'" it is not subject to this "'ongoing controversy' rule." (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 524 (*Integrated Healthcare*).)

Courts have found such topics of "widespread public interest" to include: the well-being of young children in an afterschool sports program (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 465-466 (*Hecimovich*); treatment for depression (*Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 716 (*Rivera*)); the location of registered sex offenders (*Cross v. Cooper*

9.

(2011) 197 Cal.App.4th 357, 382); the financial survival of four hospitals within one county (*Integrated Healthcare, supra,* 140 Cal.App.4th at p. 524); and a warning to consumers not to rely on doctors' ostensible experience treating professional athletes that included what the subject article described as a "'cautionary tale'" of one doctor exaggerating that experience to market his practice (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344). Because the term "public interest" is inherently amorphous, "[s]ome courts have noted commentary that ""'no standards are necessary because [courts and attorneys] will, or should, know a public concern when they see it.'"" (*Cross v. Cooper, supra,* 197 Cal.App.4th at pp. 371-372.)

Appellants argue that the alleged defamatory statements are entitled to protection under section 425.16, subdivision (e)(4), because respondent's willingness and ability to effectively serve as an emergency room physician necessarily affects the quality and accessibility of health care to the public and such accessibility is a "topic of widespread, public interest" (*Rivero, supra,* 105 Cal.App.4th at p. 924). Appellants further note that these statements were made in the context of a department-wide assessment regarding quality of care. Appellants additionally point out that, for many people in our community, emergency room care is their only access to health care.

In determining whether the communications about which the plaintiff complains were in connection with an issue of public interest, the court looks for the principal thrust or gravamen of the plaintiff's cause of action, i.e., what the cause of action is based on. (*Hecimovich, supra,* 203 Cal.App.4th at p. 465.) The key is to examine "the *specific nature of the speech* rather than the generalities that might be abstracted from it." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34.) However, the court must be careful not to confuse a defendant's alleged injury-producing conduct with the unlawful motive the plaintiff is ascribing to that conduct. In order to prevent such confusion, the court should focus squarely on the defendant's activity that gave rise to its asserted liability, and whether that activity constitutes

10.

protected speech, rather than on any motive the plaintiff may be ascribing to the activity. (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 271.)  In making this determination, the court considers the pleadings and the supporting and opposing affidavits stating the facts upon which the liability or defense is based.  (§ 425.16, subd. (b)(2); *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1417-1418.)

Appellants are correct that, in general, health care and hospital quality are topics of public interest.  (Cf. *Rivera, supra,* 187 Cal.App.4th at pp. 716-717; *Muccianti v. Willow Creek Care Center* (2003) 108 Cal.App.4th 13, 22.)  Nevertheless, we must examine the *specific nature* of the challenged statements and the degree of closeness between these statements and the asserted public interest of health care.

Based on the declarations submitted by appellants, it is apparent that the complaints about respondent concerned the financial impact on Clovis Community due to respondent's perceived inefficiency and respondent's failure to conduct herself as a collegial, team player.  Castro focused on the physician productivity needed to reduce or eliminate the subsidy paid to CEMA and Mathews outlined how respondent undermined emergency room management and eroded employee morale.  Neither complained about respondent's ability but, rather, stated that the emergency room physicians were all competent and qualified.  Thus, the challenged statements are the product of a private workplace dispute.  Appellants objected to the manner in which respondent carried out her job responsibilities, i.e., inefficient and difficult to work with, not her ability to perform those responsibilities.  This conclusion is based solely on appellants' conduct as set forth in appellants' declarations, not on any motive ascribed to appellants by respondent.  Further, unlike the cross-complainant in *Comstock v. Aber* (2012) 212 Cal.App.4th 931, respondent is not arguing that her case is not a SLAPP because the appellants did not in fact do what is alleged in the complaint.  Rather, respondent is relying on both her complaint and the declarations filed in connection with the anti-

11.

SLAPP motion to support her position that the alleged defamatory statements do not concern an issue of widespread public interest.

Appellants argue that emergency room efficiency and physician interactions with hospital staff impact the quality of patient care and therefore are issues of widespread public interest. Looking at the specific nature of this dispute, it concerns a physician's personality and profitability. Although there may be a relationship between these concerns and the general topic of quality health care, the link is too attenuated to trigger anti-SLAPP protection. The fact that a "broad and amorphous public interest" can be connected to the nature of the challenged statements is not sufficient. (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at p. 1132.) To convert these private internal grievances into an issue of widespread public interest merely because the complaints about respondent can be related to a broader health care issue would improperly provide for anti-SLAPP coverage in every employment-type case involving a physician or health care worker. This is not the purpose underlying the anti-SLAPP statute.

In sum, appellants failed to satisfy their burden of demonstrating that the challenged statements were entitled to protection under section 425.16, subdivision (e)(4). Accordingly, we do not reach the issue of whether respondent showed a probability of prevailing on the merits of her complaint.

**3.      *Attorney fees.***

Section 425.16, subdivision (c)(1), provides that the court shall award attorney fees and costs to a plaintiff who prevails on an anti-SLAPP motion if the court finds that the motion "is frivolous or is solely intended to cause unnecessary delay." Frivolousness requires a finding that the motion is totally and completely without merit. In other words, any reasonable attorney would agree such motion is totally devoid of merit. (*Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 469.) Here, however, the trial court has not yet made any findings on respondent's motion for attorney fees. In the

interests of judicial economy, the court stayed respondent's motion pending resolution of this appeal.

Respondent has requested this court to award her attorney fees on appeal. A party's right to attorney fees extends to attorney fees on appeal as well. (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1446.) If the appellate court determines that the appeal raises no new permissible arguments that change the result, and concludes that the appeal is frivolous and was intended to cause further delay of the litigation, attorney fees on appeal may be awarded. (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1309.)

Although respondent is prevailing on this appeal, we do not find that the appeal is frivolous. Whether the challenged statements were entitled to protection is not an issue that is so clear that any reasonable attorney would agree that the appeal was totally devoid of merit.

### DISPOSITION

The order is affirmed. Costs on appeal are awarded to respondent.

_____

LEVY, J.

WE CONCUR:


_____

WISEMAN, Acting P.J.


_____

DETJEN, J.

13.