Filed 10/30/13  Marriage of Bogan and Lewis CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of RICHARD M. BOGAN and LYNDA D. LEWIS. | |
| RICHARD M. BOGAN,<br><br>        Respondent,<br><br>v.<br><br>LYNDA D. LEWIS,<br><br>        Appellant. | A135913<br><br>(Contra Costa County Super. Ct. No. D03-01465) |

Lynda D. Lewis, formerly known as Lynda D. Bogan, was married to Richard M. Bogan.  The parties separated.  After a trial in 2006, the court issued its judgment, which included the ruling that Bogan's retirement or deferred compensation at Pacific Gas and Electric Company (PG&E) while married was to be divided between the parties pursuant to a Qualified Domestic Relations Order (QDRO).  Lewis filed a notice of appeal from this judgment and, after mediating their dispute, the parties entered into an agreement stating, among other things, that Bogan would pay Lewis $35,000, Lewis agreed "to waive any claim against the 401(k) funds held" in Bogan's name, and Lewis would dismiss her appeal.  The appeal was dismissed.

Years later, Bogan filed the QDRO, which included the PG&E Corporation Retirement Savings Plan (RSP).  Subsequently, he moved to modify the QDRO to

1

remove all references to the RSP, arguing that Lewis had waived any interest in the RSP pursuant to their settlement agreement. The trial court, after hearing parol evidence regarding the parties' intent regarding the meaning of Lewis's waiver of her right to the 401(k) funds, granted Bogan's request to modify the QDRO. Lewis appeals and argues that the trial court lacked jurisdiction to consider Bogan's motion to correct the QDRO, the court's interpretation of the judgment is incorrect, and the court failed to consider her request for attorney fees. We are not persuaded by Lewis's arguments and affirm the judgment.

## BACKGROUND

Lewis and Bogan were married on October 25, 1986, and separated on March 14, 2003. After a mediation on November 23, 2005, the parties entered into a Memorandum of Understanding with regard to custody and visitation of their children.

Bogan filed a schedule of assets and debts on November 29, 2005. Under the category of retirement and pensions, Bogan listed "PG&E retirement (Apportioned)" and "PSEA Credit Union ([Lewis] took funds)." Under the heading for Individual Retirement Accounts (IRA) and deferred compensation, Bogan listed "PG&E 401(k) ([Bogan's] name) (Apportioned)" and an IRA with American Capital in Bogan's name. He also listed a 401(k) with Vodafone in Lewis's name and a Roth IRA and SEP IRA in Lewis's name. He attached a statement from the PG&E Savings Fund Plan, which showed a total fund balance of $61,374.41 for the statement period of April 1, 2003, through June 30, 2003. Under other assets, Bogan also listed a number of IRA's, including two IRA's with Primerica in Lewis's name and one with Primerica in his name.

The court held a trial on December 23, 2005. The court filed its order on reserved issues on January 9, 2006.[1]

---

[1] The order "on reserved issues" and the judgment on reserved issues filed January 9, 2006, and March 6, 2006, respectively, were not included in the record on appeal. Additionally, the notice of entry of judgment, filed March 8, 2006, was

2

On March 14, 2006, the trial court filed its judgment (the 2006 judgment).[2] The court adopted the Memorandum of Understanding between the parties related to custody and visitation of the children. The court found that the date of separation for Bogan and Lewis was March 14, 2003. The 2006 judgment provided that the residential property in Alamo, California, was the community property of Bogan and Lewis.

In the 2006 judgment, the trial court reserved jurisdiction over child and spousal support and over personal property. It ruled that it did not have sufficient evidence to make a finding on support arrearages owed by either party.

With regard to the pension and retirement benefits of Bogan, the 2006 judgment stated that the court had not received sufficient evidence regarding these benefits. The judgment stated: "However, to the extent that [Bogan] acquired deferred compensation or retirement benefits through his employment with [PG&E] Company during the period of the marriage, those assets shall be equally divided between the parties pursuant to a [QDRO]." The court appointed Moon,

---

not included in the record on appeal. We requested supplemental briefing from both parties and Lewis attached these documents as exhibits to her supplemental brief. Lewis did not file a request pursuant to California Rules of Court, rule 8.155(a) to augment the record to include these documents. Since these documents were filed in this case in the superior court we, on our own motion, augment the record to include these documents. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

[2] In her supplemental brief, Lewis argues that the "judgment on reserved issues" filed on March 6, 2006, which was attached to her supplemental brief, was the final judgment. The entry of judgment filed on March 8, 2006, cites the "judgment on reserved issues." The "judgment on reserved issues" adopts the "order on reserved issues," and the rulings in this order are essentially identical to those in the judgment filed on March 14, 2006. Since there are no significant differences between the judgments filed on March 6 and 14, 2006, our reference to the 2006 judgment is to both judgments.

Schwartz, and Madden, an actuarial consulting firm, as the court's expert under Evidence Code section 730 to prepare the necessary QDRO to divide the assets.[3]

On June 30, 2006, Lewis filed a notice of appeal from this judgment. Prior to any briefing in this court, we sent the case to appellate mediation. The mediation took place on October 3, 2006.

On October 3, 2006, after mediation, the parties signed their global settlement agreement (the 2006 agreement). The 2006 agreement declared that the terms and conditions set forth in the document constituted "a full and binding settlement of all issues on appeal and any and all reserved or unreserved issues" in the dissolution action between the parties. It provided at paragraph one that Bogan was to pay Lewis $35,000. At paragraph two, it specified that Lewis agreed "to waive any claim against the 401(k) funds held" in Bogan's name. Paragraph four provided for the selling of various vehicles and detailed how the funds should be used for an educational fund for one of their two sons.

Paragraph three of the 2006 agreement specified that the parties intended "this agreement to be a global settlement such that all reserved issues are terminated except as not permitted by law." Paragraph six pronounced that the "parties waive any and all claims against the other and any and all property claims which may hereinafter arise between the parties." The following paragraph added: "If either party brings any action or proceeding against the other in violation of this [a]greement, that party shall reimburse all costs and attorneys fees incurred by the other party regardless of which party prevails." Paragraph eight stated that the appeal would be dismissed once Lewis was paid.

The parties and their attorneys signed the 2006 agreement and filed it in the trial court on October 12, 2006. On October 25, 2006, this court received the 2006

---

[3] Moon, Schwartz, and Madden apparently prepared a QDRO and provided counsel for Bogan with a copy of it. It is unclear from this record when exactly it was prepared or when counsel received it. A letter in the record from PG&E establishes that it reviewed and rejected the QDRO in November 2006.

4

agreement and Lewis's request to dismiss her appeal (A114326). We issued the remittitur on December 22, 2006.

According to Anne E. Thorkelson, Lewis's current appellate counsel (and appellate counsel in 2006), Bogan's counsel submitted to PG&E in October 2006, a QDRO with Bogan's signature. This QDRO covered the retirement plans established by PG&E.

Leslie E. Finnegan, from the law firm of Noland, Hamerly, Etienne, and Hoss, wrote a letter dated September 2, 2010, to Bogan and Lewis. She stated that the law firm was responsible for reviewing and qualifying QDRO's on behalf of PG&E Company. She disclosed that on November 9, 2006, she reviewed a proposed QDRO prepared by the Walnut Creek Family Law Center, Inc. and that the QDRO gave Lewis 43.03 percent of Bogan's 401(k) account valued as of March 14, 2003. She reported that she could not approve the QDRO because she could not use a valuation date earlier than March 1, 2004. She received a revised QDRO and the 2006 agreement, which stated that Lewis agreed " 'to waive any claim against the 401(k) funds held' " in Bogan's name. She reported that Bogan advised her that this paragraph waived Lewis's "right to the PG&E Corporation Retirement Savings Plan" and that Bogan had asked her to remove the legal hold from his savings plan account. Finnegan indicated that she was writing to confirm that Lewis was not making any claim against Bogan's savings plan.

On December 21, 2010, Lewis, in propria persona, filed a motion for, among other things, payment of spousal support arrears and relief from Bogan's failure to file the original QDRO. She also requested that the court order Bogan to comply with the fourth paragraph in the 2006 agreement.

On February 16, 2011, Bogan filed an order to show cause to "complete the division of retirement and deferred compensation benefits." Bogan wrote: "The QDRO for my 401(k) through my employment with PG&E was never completed and is the subject of a motion presently pending which is set for February 17th. . . . When (my attorney and I) started going through the files looking for pension and

5

deferred compensation documents so we could deal with [Lewis's] contention, I discovered that not only had my 401(k) not been completed; we had not divided our deferred compensation benefits to which we are entitled to half the community portion. These are omitted assets and because they were not divided, we each still own half of the community portion. . . . These include the following: Vodafone 401(k); Roth IRA's (2) with American Capital (one for each of us); SEP IRA with American Capital; IRA with SIFE Funds; 3 IRA's Primerica . . . ; IRA with Wells Fargo. . . ."

The trial court held a hearing on March 29, 2011, and Lewis appeared in propria persona. The court considered Lewis's motion regarding Bogan's compliance with paragraph four of the 2006 agreement to sell vehicles and place the funds in an educational account for one of their two sons. Lewis advised the court that she wanted this provision revised to split the funds equally between their two sons.[4] She contested the amount of money Bogan claimed he had received for the vehicles. The court found that Bogan received $3,800. The court ordered Bogan to write a check for $1,900 for the educational fund of the son who was living with Lewis and $1,900 to be put in an account for the son who was living with Bogan. The court confirmed that the parties agreed to modify paragraph four of the 2006 agreement to have the funds for the sale of the vehicles split equally between the two boys for their educational fund. Bogan also paid the spousal support in arrears.

The trial court also considered Lewis's motion regarding the QDRO. Counsel for Bogan told the court that there were two versions of the QDRO. The

---

[4] The fourth paragraph provided that Bogan "shall sell the trailer and 1997 Chevrolet pick up truck and the Layton fifth wheel 22' trailer. The money shall be placed into an educational trust for the benefit of [the name of one of their sons]. The funds shall be used for educational purposes only, including expenses for books, tuition and college fees and expenses. Any unexpended portion shall be paid to [name of one of their sons] upon his attaining the age of thirty-one (31) years."

first version, drafted by Moon, Schwartz, and Madden, used the date of separation of 2003, and the second version the firm drafted used the date of 2004.  At the end of the hearing, the court ordered the parties to take various actions to resolve the QDRO issue, including the drafting of a letter to release any hold on Bogan's 401(k) account.

On March 29, 2011, Bogan filed a request for joinder of the PG&E retirement savings plan.

On June 10, 2011, Lewis, Bogan, and Merritt L. Weisinger, Bogan's counsel, wrote a letter to Finnegan and asked her to "release any hold on the 401(k) plan of PG&E" of Bogan.  It stated:  "This release does not affect the PG&E Corporation Retirement Savings Plan or the [PG&E] Corporation Retirement Plan both of which are subject to QDRO's."

On October 28, 2011, Bogan filed the final signed and approved QDRO. This document stated that " 'RSP' means Claimant, PG&E Corporation Retirement Savings Plan . . . ."  The document stated that both Bogan and Lewis had a community property interest in Bogan's benefit under the RSP, and that Lewis's interest was 40.956 percent as of March 1, 2004.

On December 16, 2011, Bogan filed a request for an order to correct the QDRO filed on October 28, 2011, and for sanctions pursuant to Family Code section 271.  He requested that the QDRO "be corrected to delete all reference to the PG&E Corporation [RSP].  This is PG&E's version of a 401(k)" and he asserted that he paid Lewis $35,000 for her share of this plan.  He added:  "The reference to the RSP should not be in the QDRO as there is no separate 401(k) plan other than the RSP."

On December 30, 2011, Lewis, in propria persona, filed a motion to enforce the court approved QDRO and for contempt against Bogan and his attorney.  A few months later, on February 8, 2012, Lewis requested a default judgment.

The trial court held a hearing on February 21, 2012.  Bogan appeared with his attorney and Lewis appeared in propria persona.  The court dismissed without

7

prejudice Lewis's contempt motion. Finnegan, PG&E's counsel, appeared as a witness by telephone to provide the court with information on the various PG&E plans at issue. She answered questions posed by the court and parties.

Finnegan explained that Bogan had two plans available to him as a result of his employment with PG&E. The first was the RSP, formerly referred to as the PG&E Savings Fund Plan. She stated that PG&E did not refer to this plan as a 401(k) plan, but PG&E employees typically described it as their PG&E 401(k) plan or their 401(k). She added that she believed that the parties were confused about the plans when the QDRO was prepared.

Finnegan testified that the other plan was called the PG&E Company Retirement Plan and this plan was "a very traditional, defined benefits pension plan. It's the old-fashioned plan that does not maintain an account for each participant. It's one large fund of money. And then when someone retires the— the company in-house applies the formula to determine the amount of the monthly payment that is made [to] that employee. So it's a very traditional, old-fashioned plan that is not anything like a 401(k). There are not separate accounts maintained for each employee."

Finnegan stated that she received the QDRO, and sent an instruction to withdraw Lewis's share of the RSP account according to the terms of the QDRO. The QDRO stated that she was to get 40.956 percent of the total account balance on March 1, 2004, plus earnings and losses. That amount was calculated and two accounts were developed. Subsequently, Finnegan learned about the dispute regarding Lewis's interest in the RSP and counsel for Bogan told her that the QDRO would need to be amended because Lewis had already received her share at an earlier date. Consequently, a hold was placed on both accounts and the hold still remained. The hold was on the RSP and not on Bogan's regular retirement account.

Finnegan confirmed that Lewis was entitled to receive money on Bogan's pension, the regular retirement account, once Bogan reached the age of 55. She

8

added that even if Bogan continued to work, Lewis was entitled to start collecting her monthly payments on the retirement plan. Finnegan added that she did not believe that there was any dispute regarding the retirement plan.

Finnegan concluded: "Well, I think that the issue seems to be, did Lewis already get paid for her share of the RSP account? And I—there's no way for me to determine that. I know she was not paid from—by PG&E. So the question would be whether she has already received some payment outside of PG&E to— you know, to pay her that in lieu of getting a direct payment from PG&E. And there's no way that I can resolve that issue for the parties because I don't have anything to do with that."

Counsel for Bogan argued that Lewis waived any claim to the 401(k), which was the RSP plan, and in return she received $35,000 from Bogan. He stated that the RSP plan was worth only $61,374.41.

Bogan told the court that both his wife and he each had one separate 401k plan outside PG&E but the RSP was the only 401(k) plan he had with PG&E. He said that he had one worth $2,000 and Lewis had one worth about $40,000. After some discussion with his counsel and after looking at his statement of assets and debts, Bogan clarified that he was referring to an IRA with Primerica, not a 401(k). He confirmed that the only 401(k) that he had was his RSP that he referred to as a 401(k).

Lewis told the court that the waiver to her right to the 401(k) plan that she signed referred to any plan Bogan might have started during their separation. The court responded that Lewis would not have any right to a plan started after separation and Lewis answered, "That's why I signed the waiver in the global."

Weisinger, Bogan's attorney, testified that he did not realize that the 401(k) and the RSP were the same. He thought there were three plans rather than only two.

Bogan told the court that Lewis and he had 12 hours of mediation and that he was to give Lewis $35,000 for the 401(k) "because the rest of it was

9

automatically done through the state with the retirement program, you know, the pension part of it. And there's only been two things ever that PG&E has ever offered, the 401(k), as I call it, which I'm calling it wrong now, it's a savings program, and the company pension program, right, that I have nothing to do with. That's one lump sum . . . ." He explained that he always called it a 401(k) at work and did not know that it had another name.

Lewis told the court that the QDRO made it clear that she was entitled to a percentage of the RSP. She emphasized that the QDRO was signed repeatedly. She stated that counsel for Bogan indicated that there was "a mystery 401(k) out there . . . ." Lewis asserted that the payment of the $35,000 was in exchange for her dropping the appeal.

At the end of the hearing, the trial court found that Lewis waived her claim against the 401(k) held in the PG&E plan in the 2006 agreement. Lewis countered that the 2006 agreement did not say PG&E plan. The court responded: "I know it didn't. And the reason I'm doing that is because I find that to be consistent with the documents that were filed close in time to that period of time. The schedule of assets and debts that was filed refers to the PG&E savings plan, the RSP, as a 401(k). It attaches the RSP. It's nowhere listed as an RSP. It's referred to as a 401(k) plan. That is the only 401(k) plan that's listed in Bogan's name. The remaining documents listed in there—in Bogan's name are IRA's. They're not referred to as 401(k)'s." The court added that it believed that counsel for Bogan was confused, but the court did not believe that Bogan was confused. The court ruled that the QDRO needed to be revised to delete any reference to the RSP.

The trial court filed its order on March 16, 2012. The order specified that Bogan had only two retirement plans with PG&E, which were the defined benefit plan, named the PG&E Retirement Plan, and the PG&E RSP, commonly referred to as a 401(k). The court also ruled that the reference to the 401(k) funds held in Bogan's name as set forth in the 2006 agreement was to the RSP. The court found that Bogan paid Lewis $35,000 in part for her waiver of any interest in the RSP

10

and therefore the RSP was Bogan's sole and separate property. The court ordered the QDRO filed on October 28, 2011, to be revised and amended to delete all references to the RSP.

Lewis retained attorney Thorkelson and moved for a new trial and requested attorney fees. Thorkelson had represented Lewis previously from May 2006 through the end of October 2006 in Lewis's prior appeal.

Attached to Lewis's motion was a declaration by Thorkelson. Thorkelson declared that she participated in the mediation on October 3, 2006, and that Bogan's PG&E retirement benefits were not discussed and they never discussed a buy-out of the PG&E RSP plan. She also averred that there was no discussion of the QDRO or the division of retirement benefits included in the trial court's judgment. She asserted: "In my recollection of that day, the clause providing that Lewis would waive her interest in the '401(k) held in Richard Bogan's name' was a last minute request which he and his counsel insisted on including. I recall asking Lewis if she knew what he was referring to. She replied that she was pretty sure he meant one of the IRA's or 401(k)'s which he started many years earlier." She maintained that at the beginning of the mediation, Bogan offered Lewis $5,000 to dismiss the appeal. At the end of the day, the offer increased to $35,000 and Lewis accepted this offer even though counsel advised her not to accept it. Thorkelson insisted that she was the one who had demanded the language concerning the finality and completeness of the settlement to ensure that "Lewis would never be dragged back into court for any matter other than as required by law, such as child support."

Lewis also submitted a declaration and stated that at the mediation on October 3, 2006, she agreed to drop the appeal in exchange for $35,000. She maintained that they did not discuss PG&E retirement plans.

The trial court held the hearing on Lewis's motion for a new trial on June 7, 2012. The court explained that it was not going to consider any of the evidence regarding the mediation because it found that evidence was not appropriate. The

11

court added that all of the new evidence or factual issues could have been presented at the time of trial and it would not consider this new evidence.

Thorkelson told the court that the motion for a new trial was brought on the grounds of legal error, not on the grounds of mistake or neglect. She argued that the court lacked jurisdiction to consider Bogan's motion because the motion required a "reinterpretation of a final agreement" and the final judgment is "not open to debate."

At the end of the hearing, the court stated: "So the motion before me at the time was whether—was amending the QDRO, was fixing the QDRO. There had been a long line of problems with the QDRO. Clearly, I have continuing jurisdiction to enforce the [2006 agreement] and to make sure the QDRO is done. [¶] So I do have jurisdiction to address what should have been in the QDRO. The [2006 agreement] clearly states that Lynda Lewis agrees to waive any claim against the 401(k) funds held in Richard Bogan's name. Whether she paid $35,000 for that or whether she paid part of [$]35,000 for that and for other things, I don't know. There is consideration. It was in the [2006 agreement]. She was represented at the time. [¶] I need to figure out what goes in the QDRO. The 401(k) does not go [in]to the QDRO based on the evidence presented to me."

The court elaborated: "I had before me at the time the assets and debts— statement of assets and debts that listed a 401(k) in a large amount[,] which was only the PG&E document, and we had the [attorney] from PG&E say that the employees commonly referred to it as a 401(k) not by the strange language PG&E referred to it as, as an RSP."

The trial court denied Lewis's motion for a new trial and denied Lewis's request for attorney fees, noting that counsel did not file an income and expense declaration with the motion. The minute order denying the motion for a new trial was filed June 7, 2012.

On July 6, 2012, Lewis filed a timely notice of appeal from the order of March 16, 2012. (See Cal. Rules of Court, rule 8.108.)

12

On June 20, 2013, we ordered the parties to provide supplemental briefing to address the following:  "Does a trial court have continuing jurisdiction over the parties and the litigation to enforce a settlement agreement?  When addressing this issue, specify whether any final judgment has been entered.  If asserting that a final judgment has been entered, specify where in the record that document is.  Do not refer to the register of actions, but cite to actual documents in the record.  Discuss whether Code of Civil Procedure section 664.6 provides the court with continuing jurisdiction."  Both parties provided supplemental briefs.

## DISCUSSION

### I. *Jurisdiction*

Lewis contends that the trial court did not have jurisdiction to grant Bogan's request to correct the QDRO.[5]  She claims that the time to modify the 2006 judgment had lapsed.  (See *In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 499 (*Thorne*).)

When arguing that the trial court did not have jurisdiction, Lewis does not distinguish between the court's acting without any power to hear the case because it does not have jurisdiction over the subject matter or parties and the court's acting in excess of its jurisdiction.  (See, e.g., *In re Marriage of Hinman* (1992) 6 Cal.App.4th 711, 716.)  "[A] court acts in excess of jurisdiction ' "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." ' [Citations.]"  (*Conservatorship of O'Connor* (1996) 48

---

[5] We note that the brief filed by Bogan's counsel in this court does not comply with California Rules of Court, rule 8.204(a)(1)(B).  The brief does not contain a section setting forth the facts and provides essentially no argument.  The brief consists of references to pages in Lewis's opening brief and then disputes the rendition of facts or argument on that particular page.  Bogan's brief was sometimes incomprehensible and offered minimal assistance in evaluating the issues raised on appeal.

Cal.App.4th 1076, 1087-1088.) Action " 'in excess of jurisdiction' " by a court that has jurisdiction in the 'fundamental sense' (i.e., jurisdiction over the subject matter and the parties) is not void, *but only voidable.* [Citations.]" (*Id.* at p. 1088.) A stipulated judgment or other order in excess of the court's jurisdiction may not be collaterally attacked absent unusual circumstances or compelling policy considerations. (*In re Marriage of Hinman,* at p. 718, fn. 2.)

In the present case, the trial court clearly had jurisdiction over the parties and subject matter; thus, it had fundamental jurisdiction. Indeed, Lewis implicitly agrees that the court had jurisdiction as she filed her own requests for relief, including a motion for payment of spousal support arrears, relief from Bogan's failure to file the original QDRO, and a request to enforce paragraph four of the 2006 agreement.

Lewis's argument is essentially that the trial court acted in excess of its jurisdiction. She maintains that the time for requesting relief from judgment under Family Code sections 2120 through 2129 and Code of Civil Procedure section 473, subdivision (b), had expired. (See *Thorne, supra,* 203 Cal.App.4th 492.) She asserts that Family Code section 2122 provides the time limits and grounds for filing a motion to set aside a judgment. Bogan, according to Lewis, failed to comply with the time requirements and his reason for requesting relief was not one of the specified grounds under this statute. (Fam. Code, § 2122 [motion to set aside a judgment may be based on actual fraud, perjury, duress, mental incapacity, or mistake].)

We agree that if Lewis's characterization of the trial court's action were correct and Bogan's request to modify the QDRO required the court to modify the judgment, the time to make such a request has lapsed and the trial court acted in excess of its authority when granting Bogan's motion. If, however, the request to modify the QDRO resulted in the trial court's enforcing, not modifying, the judgment, then the trial court had authority to provide Bogan with the requested relief.

14

Code of Civil Procedure section 664.6 provides the following: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

The record on appeal in this case contains no document (and the parties in their supplemental briefing submitted no document) indicating that either party asked the trial court to merge the 2006 agreement into the 2006 judgment. Pending its merger into the judgment pursuant to Code of Civil Procedure section 664.6, the 2006 agreement remained enforceable by contract remedies. (See *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1220-1221.) Furthermore, a party stipulating to an agreement is estopped from arguing that the court acted in excess of its jurisdiction when enforcing the agreement. (*Conservatorship of O'Connor, supra,* 48 Cal.App.4th at p. 1098.) Here, Lewis accepted the benefit of the 2006 agreement; it is undisputed that she received the payment of $35,000 pursuant to paragraph one of the 2006 agreement.

Additionally, Lewis filed a motion on December 21, 2010, requesting the trial court to, among other things, enforce paragraph four in the 2006 agreement. At the hearing on March 29, 2011, the parties agreed to modify paragraph four of to have the funds from the sale of the vehicles be divided equally for the educational funds of their two sons rather than have the money go solely to one son's educational fund. The court then ordered Bogan to pay $1,900 into each son's account. Thus, Lewis participated in or consented to the court's authority to enforce the terms of the 2006 agreement and she is precluded from attacking the court's authority to enforce it, "absent exceptional circumstances." (*In re Marriage of Hinman, supra,* 6 Cal.App.4th at p. 716.) We need not determine whether the stipulated 2006 agreement was valid but simply that Lewis cannot

15

now challenge its validity and its merger into the 2006 judgment. (See *id.* at p. 718.)

The 2006 agreement merged into the 2006 judgment (modified judgment) and the trial court could enforce it under Family Code section 290.[6] Family Code section 290 provides: "A judgment or order made or entered pursuant to this code may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary." This statute gives the court broad discretion to fashion orders enforcing Family Code judgments and orders, so long as they do not conflict with express statutory requirements and limitations. (*In re Marriage of Schofield* (1998) 62 Cal.App.4th 131, 135.) Accordingly, we review the trial court's decision that it had the authority to grant Bogan's request to modify the QDRO because this was necessary to enforce the modified judgment for an abuse of discretion.

In the trial court, Lewis maintained that she was entitled to her community property interest in the RSP under the 2006 judgment and that the filed QDRO accurately reflected her interest. Bogan countered that Lewis waived her interest in the RSP in the 2006 agreement and therefore the QDRO should not have included the RSP. Consequently, in order to resolve this dispute and enforce the modified judgment, the trial court had to interpret the 2006 agreement. Once it concluded that Bogan's requested modification of the QDRO was in accordance with the modified judgment, it had the authority under Family Code section 290 to grant Bogan's request to modify the QDRO and did not act in excess of its jurisdiction.

Lewis contends that the trial court's action was improper because it considered parol evidence to contradict the unambiguous terms of the judgment. In support of this argument she cites *Thorne, supra,* 203 Cal.App.4th 492. She

---

[6] We note that neither party mentions this code section.

16

maintains that Bogan's motion to correct the QDRO is similar to the wife's motion to set aside a stipulated dissolution judgment in *Thorne*, and the appellate court in *Thorne* reversed the trial court's granting of the wife's motion.

In *Thorne, supra,* 203 Cal.App.4th 492, the husband and wife entered into a stipulated marital dissolution judgment in 1999 and, in 2010, the wife moved to set it aside on the basis that she learned that California "courts apply the 'time rule' for apportioning a pension's community and separate property interests." (*Id.* at p. 495, fn. omitted.) The trial court found that the parties intended to enter into an agreement that complied with California law and ruled that the division of the pension was contrary to law. (*Id.* at pp. 495-496.) The court therefore modified the judgment to divide the pension according to the " 'time rule.' " (*Id.* at p. 496.)

The appellate court in *Thorne, supra,* 203 Cal.App.4th 492, stated, "Generally, once a marital dissolution judgment has become final, the court loses jurisdiction to modify or alter it." (*Id.* at p. 499.) The time to file a motion to set aside the judgment had lapsed, and the court has jurisdiction to modify the judgment only when the judgment contains an express reservation of jurisdiction authorizing modification, a community asset was omitted from the judgment, or the party is entitled to equitable relief because of extrinsic fraud or mistake. (*Id.* at pp. 500-501.) The Court of Appeal rejected the argument that the husband's pension was omitted. (*Id.* at p. 501.) The court stated that the "words of the judgment expressly divid[ed the husband's] entire pension." (*Id.* at p. 502.) The pension provision in the judgment stated that the parties agreed to allocate 16 percent of the pension. (*Id.* at p. 504.) The Court of Appeal concluded that the trial court erred in its construction of the language of the stipulated judgment by relying on the wife's testimony about her understanding of the agreement's terms because the wife's testimony that they intended to allocate according to the " 'time rule' " contradicted the express provision of the contract. (*Ibid.*) Moreover, the court stressed that the trial court erred when it found that the parties' agreement

17

was unlawful. (*Ibid.*) The appellate court concluded: "Here, if the parties intended to enter into a legally binding agreement that complied with California law, the evidence is that they did so. They negotiated and divided [the husband's] pension and their other assets. That the parties were ignorant of the 'time rule' does not render their actual agreement unlawful." (*Ibid.*)

Lewis contends that the trial court in the present case, similarly to the one in *Thorne,* improperly considered the testimony of Bogan to interpret and modify the 2006 judgment. She further asserts that neither the 2006 judgment nor the 2006 agreement contained a reservation of jurisdiction to modify the judgment. She argues that the trial court incorrectly believed it could modify the terms of the judgment in order to enforce the judgment, but that its action was "*adjudication*, which the lower court had no power to do."

The provision in the 2006 judgment that divided the RSP was clear; we thus agree that admission of parol evidence contradicting that term would be improper if the 2006 judgment were never modified. In such a situation, the original QDRO filed by Bogan was consistent with the 2006 judgment and the modification of that QDRO would be contrary to the express terms of the judgment and the trial court's action would be an abuse of discretion.

In the present case, however, the trial court did not modify the 2006 judgment; Lewis and Bogan modified the judgment when they entered into the 2006 agreement. The court thus had to determine whether the requested modification of the QDRO complied with the modified judgment. As explained more fully below, the 2006 agreement was not unambiguous. Thus, the present situation is not the same as the situation in *Thorne.* Lewis may disagree with the trial court's interpretation of the 2006 agreement, but her characterization of the court's action as modifying the judgment is incorrect. Accordingly, we conclude that the trial court did not act in excess of its jurisdiction and did not abuse its discretion when it concluded that the granting of Bogan's request to modify the QDRO was necessary to effectuate the modified judgment.

18

## II. *Interpretation of the 2006 Agreement*

Lewis contends that the trial court erred when it interpreted the 2006 agreement. She maintains that the court incorrectly interpreted the evidence presented at trial as showing that her waiver of her interest in the 401(k) was to her interest in the RSP.

The fundamental goal of contractual interpretation is "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639.) Words in a contract are generally applied in their ordinary and popular sense. (Civ. Code, § 1644.) A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates, and preference should be given to the general intent over particular words and clauses. (Civ. Code, §§ 1647, 1650, 1652, 1653.) "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.)

The trial court "generally may not consider extrinsic evidence . . . to vary or contradict the clear and unambiguous terms of a written . . . contract. [Citations.] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' [Citation.]" (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

19

"The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." (*Winet, supra,* 4 Cal.App.4th at p. 1165.) In this case, the trial court concluded that the 2006 agreement was reasonably susceptible to the interpretation set forth by Bogan and permitted extrinsic evidence.

The trial court's threshold determination of ambiguity and need for extrinsic evidence is a question of law subject to independent review. (*Winet, supra,* 4 Cal.App.4th at p. 1165.) However, "[o]ur review of the trial court's interpretation of the agreement is governed by the settled rule that where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Accordingly, we defer to the trial court's construction if it was a reasonable construction of an ambiguous clause, and is supported by substantial evidence, when the trial court's ruling was based on conflicting evidence as to the intention of the contracting parties.

Here, the 2006 agreement is reasonably susceptible to the interpretation urged by Bogan. He asserted that the waiver in paragraph two of any claim to the 401(k) funds held in Bogan's name referred to his RSP with PG&E and that was the intent of the parties because he did not have any other 401(k). The 2006 agreement did not provide specific information clearly identifying the 401(k) described in paragraph two, and we therefore conclude that the trial court properly

20

heard evidence to determine the parties' intent regarding the funds referred to as the 401(k) plan.

The extrinsic evidence presented in the trial court supported the trial court's conclusion that the parties intended the waiver in paragraph two to apply to the RSP. As already discussed, paragraph one of the 2006 agreement provided that Bogan was to pay Lewis $35,000. The following paragraph provided that Lewis agreed "to waive any claim against the 401(k) funds held" in Bogan's name. In addition to considering that the waiver directly followed the agreement to pay Lewis $35,000, the court reviewed evidence that the assets and debts filed by Bogan on November 29, 2005, showed that he had a PG&E Savings Fund Plan (the former name for the RSP), worth about $63,374.41 for the statement period of April 1, 2003, through June 30, 2003. Thus, $35,000 was more than one-half the value of that PG&E Savings Fund Plan. In his schedule of assets, Bogan did not write PG&E Savings Fund Plan or RSP but referred to a PG&E 401(k) plan. Bogan testified that he always called the RSP a 401(k) and, other than his pension program, that was the only PG&E retirement account he had.

The court also heard the testimony of Attorney Finnegan, who reviewed and qualified QDRO's on behalf of PG&E. She explained that the RSP had formerly been referred to as the PG&E Savings Fund Plan, and that PG&E employees typically referred to this fund as a 401(k) plan. The only other plan was the PG&E Company Retirement Plan and that was a defined benefits pension plan and separate accounts were not maintained for each employee. This evidence amply supported the trial court's conclusion that Lewis's waiver in the 2006 agreement was to the RSP.

Lewis never provided a credible explanation as to what other 401(k) plan Bogan had. She claimed that she believed that she was waiving her right to any plan that Bogan might have started during separation. The trial court, however, properly rejected this explanation because Lewis did not have any right to a plan Bogan started after separation. Lewis also maintained that the $35,000 was to

21

drop the appeal, but the court could conclude that this payment was, at least in part, for her waiver of her interest in the RSP.

Lewis asserts that the "entire proceeding may have been in error because according to the clerk's transcript, [Bogan] omitted the third page of the copy of the [2006 agreement] with his exhibits." On December 16, 2011, Bogan filed his request to modify the QDRO and attached numerous exhibits, including the 2006 agreement. The document attached was missing the third page, which included the signatures of Lewis, Bogan, Weisinger, and Thorkelson and paragraphs eight and nine. Paragraph eight stated that "[t]he appeal shall be dismissed upon payment by" Bogan. Lewis argues that the court must never have seen the third page because the court discounted her assertion that the $35,000 was for dismissing the appeal. When she told the court that the money was for dismissing the appeal, the court responded that the agreement did not say that.

The trial court's statement that the 2006 agreement did not specify that the $35,000 was for dismissal of the appeal is correct. The first paragraph in the 2006 agreement stated that Bogan was to pay Lewis $35,000. This provision did not indicate or suggest that the money was for dropping the appeal. Paragraph eight indicated that Lewis would not dismiss her appeal until she received this $35,000, but it did not indicate the payment was for dropping the appeal.

Additionally, Lewis cannot challenge the trial court's ruling on the basis that Bogan's exhibit did not include the third page of the 2006 agreement. Lewis never objected on this basis in the lower court. Moreover, the superior court's file did contain the entire 2006 agreement. All three pages of the 2006 agreement were filed in the court on October 12, 2006, and this entire agreement was in the court file. Thus, the court clearly had a copy of the entire agreement.

In any event, it is immaterial because the trial court's comments and ruling made it clear that it rejected Lewis's explanation of paragraph two of the 2006 agreement. The court's findings were based on its conclusion that Bogan's explanation was credible and Lewis's explanation was incredible. The court

22

stated: "It doesn't say [the $35,000 is] for the appeal. It just says it's 35—. But that—to make a real big point about [Lewis's] dropping any claim in [Bogan's] 401(k) because she at that point thought he might have had a 401(k) after the date of separation, doesn't really make sense. [¶] I think things got confused later with PG&E and the fact that PG&E changed the name of the plan and things like that. But I believe—I find [Bogan] credible about his understanding about the agreement."

Lewis maintains that the trial court incorrectly believed that the 2006 agreement replaced or superseded the 2006 judgment. She asserts that the final judgment was earlier and the mediation had no impact on this judgment, which included the original QDRO. She asserts that the retirement benefits were not the subject of her appeal and therefore the decision regarding the QDRO was final.

The 2006 judgment specified that "[t]he court did not receive sufficient evidence concerning the pension and retirement benefits" of Bogan. It added, "to the extent that [Bogan] acquired deferred compensation or retirement benefits through his employment with [PG&E] Company during the period of the marriage, those assets shall be equally divided between the parties pursuant to a" QDRO. The court then ordered an accounting firm to prepare the QDRO.

The 2006 agreement provided that "the terms and conditions set forth herein constitute a full and binding settlement of all issues on appeal and any and all reserved or unreserved issues in the above-referenced Superior Court between said parties." There is nothing in the settlement agreement that suggests the parties were modifying only those issues related to Lewis's appeal. It is immaterial that Lewis was not appealing that portion of the judgment regarding the pension and retirement accounts. Lewis was entitled to agree to give up her right to the RSP in return for the settlement of other issues.

In urging this court to conclude that the 2006 judgment could not be modified by the 2006 agreement, Lewis relies on *Muccianti v. Willow Creek Care Center* (2003) 108 Cal.App.4th 13 (*Muccianti*). *Muccianti,* however, is

23

unavailing. *Muccianti* involved a stipulated reversal of a multimillion-dollar verdict against a health care facility. After a jury trial, the defendant appealed. The parties settled, and the plaintiffs agreed to consent to vacate the judgment in return for the defendant's dismissing the appeal. (*Id.* at p. 18.) The appellate court considered the defendant's motion to vacate the judgment and the plaintiffs' motion to dismiss the appeal. The appellate court cited the statutory presumption against stipulated reversals in civil judgments under Code of Civil Procedure section 128, subdivision (a)(8). It explained that a civil judgment "now belongs to the public—not the parties—and the public indisputably has an interest in [their] continuing existence." (*Muccianti,* at p. 15.) The *Muccianti* court therefore refused to vacate the judgment and dismissed the appeal as moot. (*Id.* at pp. 15 & 21.)

The present case is not a request to an appellate court to sanction a reversal of a judgment in a civil case after a jury trial. The policy considerations at issue in *Muccianti* are clearly not present in a marriage dissolution case. Code of Civil Procedure section 128 has no application to the present case. Furthermore, as already discussed, Lewis cannot challenge the validity of the 2006 agreement since she has already accepted the benefits of this agreement.

Lewis also argues that the court's interpretation of the 2006 agreement is an absurdity because it results in Lewis's agreeing to dismiss her appeal for no consideration. She asserts that she had no reason to dismiss the appeal except for the promise of $35,000.

The 2006 agreement contained a number of provisions, including the promise that all issues between the two parties would be settled and the promise that the contentious litigation and the costs of litigation would end. Thus, Lewis could have agreed to dismiss her appeal in return for the resolution of the issues regarding the sale of the truck and trailer, as well as each party's promise to "waive any and all claims against the other and any and all property claims which may hereinafter arise between the parties."

24

Lewis also disputes the trial court's findings regarding the evidence. She contends that the trial court should not have considered Bogan's schedule of assets and debts. However, Lewis did not object to the admission of this evidence in the trial court. In order to preserve a claim of evidentiary error for appellate review, Lewis had to make a contemporaneous and specific objection in the trial court. (Evid. Code, § 353, subd. (a).) Having failed to object to this evidence in the trial court, she forfeits any claim that this evidence was improperly admitted.

Lewis also maintains that the trial court improperly ignored Bogan's admission that he had two 401(k)'s. Lewis is correct that Bogan initially told the court that he had two 401(k)'s. He later clarified that he had only the one 401(k) with PG&E, which was actually the RSP. The statement of his assets and debts confirmed that he listed only one 401(k) and the attachment included the RSP, and no 401(k), as an exhibit. The schedule listed a number of IRA's owned by either Lewis or him, and listed no other 401(k). The documentary evidence and Bogan's explanation for his initial mistake supported the trial court's finding that the 2006 agreement was referring to the RSP when it stated that Lewis waived any claim to Bogan's 401(k).

Additionally, Lewis asserts that the trial court should have given the greatest weight to the parties' signing of the QDRO three days after the parties signed the 2006 agreement, which divided the RSP between Bogan and her. She claims that this was the "most powerful evidence presented of [the] parties' mutual intent . . . ." She then argues that the trial court committed error when it concluded that Bogan's counsel was confused about what happened to the 401(k) but Bogan was not confused, and cites *Winet, supra,* 4 Cal.App.4th 1159. She maintains that "evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." (*Id.* at p. 1166, fn. 3.)

In *Winet, supra,* 4 Cal.App.4th 1159, the parties settled a lawsuit and negotiated a general release as part of the settlement. Years later, one of the

25

releasing parties sued and the claim in the lawsuit fell within the scope of the release. The court noted that "[i]n no fewer than three distinct places the parties declared their intention to release each other from *all* claims, known and unknown, suspected or unsuspected . . . ." (*Id.* at p. 1166.) In affirming the lower court's grant of summary judgment and refusal to hear testimony on the releasor's subjective intention, the court explained that "[i]t is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." (*Ibid.*)

Here, unlike the situation in *Winet,* Bogan's testimony as to what he subjectively understood the 401(k) to mean was not the sole evidence presented. The extrinsic evidence of his schedule of assets and documents as well as the testimony of Finnegan established that PG&E employees often referred to the RSP as a 401(k) and that Bogan had no other 401(k).[7] Accordingly, the court could consider this competent extrinsic evidence and weigh it against the fact that the signed QDRO included the RSP.

Lewis argues that the court erred because the contract should have been interpreted against Bogan because he was the person who created the ambiguity and she cites Civil Code section 1654. She claims that he created the uncertainty by not providing sufficient information about the 401(k). She also claims that the court failed to consider whether Lewis's waiver of her claim to the 401(k) in the 2006 agreement, which was to an important statutory right, was done knowingly and intelligently.

Bogan's attorney might have drafted the 2006 agreement, but he simply memorialized the terms of the agreement resulting from the mediation, and both Lewis and Thorkelson signed it. Thus, the rule of Civil Code section 1654 does not apply and Lewis cannot claim that she did not understand the rights she was waiving as she had legal representation. Moreover, Code of Civil Procedure

---

[7] Additionally, unlike the situation in *Winet,* here the language of paragraph two in the agreement was ambiguous.

section 1654 "is to be used only when there is no extrinsic evidence available to aid in the interpretation of the contract or where the uncertainty cannot be remedied by other rules of interpretation. [Citations.] The rule does not stand for the proposition that, in every case where one of the parties to a contract points out a possible ambiguity, the interpretation favored by the nondrafting party will prevail." (*Rainier Credit Co. v. Western Alliance Corp.* (1985) 171 Cal.App.3d 255, 263.) The evidence in the record, as already stressed, supports the finding that the 401(k) referred to the RSP.

Accordingly, we conclude that the trial court did not err in considering extrinsic evidence and substantial evidence supported its construction of the agreement.

### III. *Attorney Fees*

Lewis contends that the trial court erred in refusing to consider her request for attorney fees. Lewis requested attorney fees on December 21, 2010, when she filed a motion for spousal support; on March 17, 2011, when requesting a dismissal; on May 6, 2011, when requesting an order to show cause; on December 30, 2011, when filing her motion for enforcement of the court order and for contempt; on February 6, 2012, when opposing Bogan's motion to modify the QDRO; and on April 9, 2012, when she filed a motion for a new trial. Lewis was in propria persona in the proceedings at issue on this appeal, except she retained Thorkelson to represent her after the court granted Bogan's request to modify the QDRO. Thorkelson had previously represented Lewis from May 2006 through the end of October 2006.

In support of her motion for attorney fees filed on April 9, 2012, Lewis declared the following: "I have incurred over $7,500 in attorneys' fees since [Bogan] began this campaign against me. I need the fees, and—since Weisinger has received over $200,000 for his participation in this case—I know he can afford to pay. I am also entitled to fees for Bogan's and Weisinger's bringing of further proceedings against me for claims not specifically excepted by law or the [2006

27

agreement]. Under [paragraphs] 6 and 7, both Bogan and his counsel should be found personally liable to me for all of the costs and attorneys fees incurred in defending against their extraordinary and relentless refusal to be done and to leave me alone."

Thorkelson also filed a declaration on April 9, 2012, and she stated that Lewis had "incurred total fees for my work on this case since the beginning of 2012 of over $7,500. My ordinary and regular fee is between $350 and $400 per hour. I will be happy to provide as much further information as the court wishes if it enforces [Bogan's] obligation to provide full disclosure of the attorneys fees and costs incurred by [Bogan] throughout this case, as required by law."

On June 7, 2012, at the end of the hearing when the trial court announced that it was denying Lewis's motion for a new trial, Thorkelson stated: "I'm also requesting attorney's fees, which [Lewis] desperately needs in order to finish it up. If the court would prefer a separate motion—she's already at 10,000 for this. [¶] Lewis has never had any money to pay for an attorney. Under the currently applicable attorney's fees statute, Bogan has a mandatory duty to pay because he can afford it and she needs it."

The court responded: "And you didn't file an income and expense declaration with your motion, so it's denied." Counsel asked if she could bring a motion for fees and the court answered: "No. It's denied."

Family Code section 2030, subdivision (a)(1) provides that in a proceeding for dissolution of marriage, "the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."

28

"It may be a little surprising to some, but the purpose of [Family Code] section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength. [Citation.]" (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251-252.)

Family Code section 2030, subdivision (a)(2) states that "[w]hen a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."

Family Code section 2032, subdivision (b) requires a "court [to] take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately," including "to the extent relevant, the circumstances of the respective parties described in [Family Code section] 4320. . . ."

"In making this determination, the trial court has broad discretion" and "we will not reverse absent a showing that no judge could reasonably have made the order, considering all of the evidence viewed most favorably in support of the order. [Citation.]" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 975.) However, " 'the record must reflect that the trial court actually exercised that discretion, and considered the statutory factors in exercising that

29

discretion.' [Citation.]" (*Ibid.*) Thus, a court's affirmative failure or refusal "to exercise that discretion" constitutes "sufficient grounds, by itself, to reverse [its] decision." (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1314.)

"While no particular language is required in an order awarding attorney fees . . . , the record (including, but not limited to, the order itself), must reflect an actual exercise of discretion and a consideration of the statutory factors in the exercise of that discretion. [Citations.]" (*Alan S. v. Superior Court, supra,* 172 Cal.App.4th at p. 254.)

Lewis contends that the trial court in the present case refused to exercise its discretion and therefore we must reverse the denial of her request for attorney fees. We disagree. The court denied Lewis's request based on her failure to file any income and expense declaration. As the moving party, Lewis had the burden of proof to present evidence showing she had a need for an award of attorney fees. (*Straub v. Straub* (1963) 213 Cal.App.2d 792, 799.) Rather than submit any evidence, she simply declared that she needed the money.

Furthermore, Family Code section 2032 requires that need-based attorney fees awards be based on, among other factors, the relative financial needs of the parties. (Fam. Code, § 2032, subds. (a), (b).) Lewis did not present *any* evidence showing she had a need for an award of attorney fees either before or at the time of her motion. She also failed to make any showing regarding the relative financial needs of Bogan and her. The record on appeal does not contain any current income and expense declaration filed by Lewis. Such a declaration is *required* for all motions for attorney fees under section Family Code section 2030. (Cal. Rules of Court, rules 5.427, 5.92(a)(5) ["completed *Income and Expense Declaration* (form FL-150) or *Financial Statement (Simplified)* (form FL-155) must be filed . . . when relevant to the relief requested"].) California Rules of Court, rule 5.427(a) and (b) states that attorney fees and costs requests based on financial need, as described by various Family Code statutes, including section 2030, "must" include, among other things, form FL-310, which is a request for

30

attorney fees and costs attachment, form FL-150, which is a *current* income and expense declaration, and an explanation of why the requested fees and costs are just, necessary, and reasonable.  (See also Cal. Rules of Court, rule 5.427(d).)

Thus, Lewis has failed to affirmatively demonstrate that the trial court abused its discretion in refusing to order the attorney fees she requested, as she presented no evidence regarding the parties' relative financial positions.  (See *In re Marriage of Falcone & Fyke, supra,* 164 Cal.App.4th at p. 824 [no error in denying oral motion for attorney fees because there was no evidence on parties' relative financial positions].)

## DISPOSITION

The judgment is affirmed.

_____

Brick, J.*


We concur:


_____

Kline, P.J.


_____

Haerle, J.



* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.